# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JONATHAN JACKSON

       Plaintiff,

v.                                Case No. 8:19-cv-3111-WFJ-CPT

HAINES CITY, FLORIDA

       Defendant.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff Jonathan Jackson is a 55-year-old African American man who currently works for the Haines City Utilities Department. In this action, Jackson sues the City for discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The City now moves for summary judgment. Dkt. 30. The motion is fully briefed. After considering the parties' submissions, the record, and applicable authorities, the Court concludes that Jackson's claims fail as a matter of law. The motion is granted, and judgment will be entered for the City.

# I. FACTUAL RECORD

In October 2011, Mr. Jackson began working for the City as a Service Worker I in the Maintenance Division of the Utilities Department. Dkt. 32 at 66. Jackson's work consists of installing water meters, reading meters, and repairing leaks in the City's water lines. Dkt. 48 at 23. During his time with the City, Mr. Jackson has been promoted, received multiple pay raises, and has generally received positive performance reviews from his supervisors. Dkt. 32 at 66. Since being promoted to the position of Pipeline Repair Lead in 2017, Jackson has worked in a supervisory role in charge of anywhere between three and fourteen employees. *Id.* at 9, 66; Dkt. 48 (Jackson Depo.) at 34–35. Yet despite his successes, Mr. Jackson claims that throughout his time working for the City he and other black employees have been treated worse than their white counterparts, and when he has complained about this, his supervisors have retaliated against him. Dkt. 32 at 117; Dkt. 48 at 60–61, 117.

## A. Jackson's Anonymous Complaint and Promotion

In September 2016, Mr. Jackson submitted an anonymous, typed letter to the City's Human Resources (HR) Director alleging ongoing discrimination, harassment, and inequitable treatment within the Utilities Maintenance Division. Dkt. 48 at 64; Dkt. 48-2 at 2. The HR Director investigated the claims raised in the letter and interviewed several Maintenance Division employees, including Jackson.

2

Dkt. 48 at 65. When interviewed, Mr. Jackson made general complaints about the Department's management and tension among his coworkers but did not report any racial discrimination. Dkt. 48 at 79; *see* Dkt. 48-2 at 2–14. Following the investigation, Jackson was promoted to Pipeline Repair Lead. Dkt. 48-3.

Up to that point, Jackson had never received a verbal or written reprimand while working for the City. Dkt. 48 at 121–22. But about three months after the letter, Jackson received his first write up when he went to get coffee after clocking in to begin his shift. *Id.* at 59–60. Jackson claims that another employee had done the same thing previously but was not reprimanded. *Id.* at 59. In September 2017, a year after the letter, Mr. Jackson received another write up, this time for insubordination after he walked out of a scheduling meeting with his supervisor and the other Division Leads. Dkt. 48-7. Both writeups, Mr. Jackson believes, were retaliation for his anonymous letter, even though Jackson never told anyone that he wrote it. Dkt. 48 at 64, 99–100.

### B. Jackson's Pay Inquiry and the Utilities Department Reorganization

In April 2018, Jackson filed a pay grievance after discovering he was not receiving "on-call" pay the same as one of his white counterparts. *Id.* at 42–43. The Leads in the Maintenance Division are required to carry a City-issued cellphone on a rotational basis so they can respond to emergencies that arise after normal

business hours. *Id.* at 14. For this added responsibility, Leads receive "on-call" pay on top of their regular hourly and overtime pay. *Id.* at 15, 43.

Mr. Jackson informed his supervisor that he was not receiving on-call pay. Jackson's supervisor did not know why this was the case and instructed him to notify HR. *Id.* at 43. Jackson notified HR of the issue. The City's HR Director investigated and determined that Jackson had not been paid for all his on-call time, in large part because he had not added on-call pay to his timecard, which was his responsibility. Dkt. 32 at 68; Dkt. 48 at 43–44. After the investigation, the City back paid Jackson $4,425. Dkt. 32 at 68. At no point during this process did Jackson claim he had not been paid properly because of his race. *See* Dkt. 32 at 69; Dkt. 48 at 43–44.

Seven months after filing the pay grievance, in November 2018, Mr. Jackson received a written reprimand for failing to complete an unrelated assignment. Dkt. 48-9. Earlier that April, Jackson had been tasked with locating valves on the City's old water lines so they could be shut down and connected to the new water main. Dkt. 32 at 121. Jackson and his team failed to locate the valves and shut down all the old lines by the date his supervisors had designated. *Id.* As a result, the private contractor the City had paid to connect the water lines had to delay work for two weeks and charged the City an additional fee to reschedule the job. *Id.*; Dkt. 48-9.

4

In late 2018 and early 2019, the Utilities Department underwent an internal reorganization. Dkt. 32 at 120. The restructuring was an efficiency measure in response to the City's recent growth. *Id.*

As part of the reorganization, Jackson's position, Pipeline Repair Lead, was divided into three equal positions. *Id.* Jackson was assigned to one of these roles—Meter Lead. *Id.* at 121. Jackson's hourly pay rate remained the same and was higher than the rate paid to the men in the other two positions. Dkt. 32 at 67; Dkt. 48 at 24. But Jackson's on-call time and overtime hours were reduced, which in Jackson's estimation cut his annual pay from around $48,000 down to $38,000 or $39,000. Dkt. 48 at 13. Jackson also went from supervising ten to fourteen employees to supervising only three employees. *Id.* at 24.

With the reorganization, the City also created the position of Maintenance Division Supervisor by reclassifying the Pipe and Motor Lead position.[1] Dkt. 32 at 120. Jonathan Vice, a white male, was the Pipe and Motor Lead at the time and became Division Supervisor after the reorganization. Dkt. 32 at 120–21.

---

[1] In her sworn declaration provided to the Court, Utilities Department Director, Tracy Mercer, referred to this position as "Department Supervisor." The Utilities Department is divided into three divisions: the Water Division, Wastewater Division, and Utilities Maintenance Divisions. *See* Haines City Official Website, Utilities Department, http://hainescity.com/217/Utilities-Department (last visited July 16, 2021). It seems the position Mercer was referring to was Supervisor of the Utilities Maintenance Division, not the entire Utilities Department. *See* Dkt. 32 at 120.

Around this same time, feeling stressed and overworked, Mr. Jackson requested a transfer to the Utilities Department's Water Division.[2] Dkt. 48 at 82. Jackson applied for the position of Water Operator Trainee, a position three pay grades below his Meter Lead position. *Id.*; Dkt. 32 at 68, 122.

Before granting Jackson a permanent transfer, Utilities Director Tracy Mercer allowed Jackson to work in the Water Division for thirty days so he could be sure this was a change he wanted to make. Dkt. 32 at 122. After thirty days, Jackson could (1) return to his Meter Lead position in the Maintenance Division, (2) remain in the Water Division and perform additional maintenance duties for the Utilities Department, or (3) remain in the Water Division and perform no additional duties. Dkt. 48-5. The second and third options required Jackson to take a pay cut.[3] *Id.* Jackson ultimately decided to return to his job as the Meter Lead. Dkt. 48-4.

### C. Jackson's EEOC Charge and Alleged Post-Charge Retaliation

After returning to the Maintenance Division, on April 25, 2019, Jackson filed a discrimination charge with the Equal Employment Opportunity Commission

---

[2] Mr. Jackson cannot recall but believes the reorganization happened while he was working as a trainee in the Water Division. Dkt. 48 at 22.

[3] At the time, Jackson's hourly salary as a Meter Lead was $17.87. Under option 2, his salary would be reduced to $14.77 (an 18% decrease). Under option 3, his salary would be $12.21 (a 32% decrease). Dkt. 48-5.

(EEOC) against the City. Dkt. 32 at 117. Jackson claimed that the City had discriminated against him because of his race and retaliated against him every time he made a complaint. *Id.* The charge specifically mentioned Jackson's pay grievance and the write up he received seven months later for failing to prepare the old water lines for connection to the new water main. *Id.* Jackson also stated that he was subjected to discriminatory comments from co-workers. For example, a co-worker once said, "There are too many people that look like [Jackson], and that we need more whites working here." *Id.* Jackson also claimed that the stress of working in such a hostile environment and the lack of action in response to his complaints forced him to request a transfer to the Water Division. *Id.* at 118.

Seven months after Mr. Jackson filed the charge, his supervisors placed him on a 90-day performance improvement plan for his poor job performance. Dkt. 48-1. The plan identified areas of Jackson's job performance that needed improvement, such as time management, the ability to meet deadlines, and the need to better train his subordinates. *Id.* at 1. The plan gave Jackson tasks to complete to improve these areas of concern and warned that failure to significantly improve his performance could lead to further disciplinary action or termination. *Id.* at 1–5.

**D. The Lawsuit**

After receiving a right to sue letter from the EEOC, Jackson filed this lawsuit. Dkt. 1. Jackson asserts two counts against the City. Count I alleges race and age discrimination in violation of the ADEA. Count II is a Title VII racial discrimination and retaliation claim. The City answered the complaint and has moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A mere "scintilla of evidence" supporting the nonmoving party's position will not suffice. *Id.* at 252. When deciding whether a reasonable jury could return such a verdict, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

The City argues it is entitled to judgment on Jackson's ADEA and Title VII claims. The Court will address these claims in turn.

### A. Count I: Race and Age Discrimination under the ADEA

Jackson's first count alleges that the City violated the ADEA by treating him differently than younger employees and those of a different race. Dkt. 1 ¶ 13. The Court can summarily dispense with this count because Jackson has not satisfied the conditions precedent for asserting an ADEA claim.

Before filing a civil action, the ADEA requires an individual to exhaust his available administrative remedies by filing a charge with the EEOC identifying the specific acts of unlawful discrimination that occurred. *See* 29 U.S.C. § 626(d)(2); *Anderson v. Embarq/Sprint*, 379 F. App'x 924, 926 (11th Cir. 2010) ("Before filing suit under Title VII, the ADA, or the ADEA, a plaintiff must exhaust the available administrative remedies by filing a charge with the EEOC."). This requirement serves to give the EEOC the first opportunity to investigate claims of alleged discrimination and allows the EEOC to perform its role of promoting conciliation and avoiding litigation. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004).

The exhaustion requirement also serves another important function by limiting the claims in a subsequent civil action to those that "amplify, clarify, or more clearly focus" the allegations in the EEOC charge. *Id.* at 1279. Thus, a plaintiff may not allege new acts of discrimination in a civil suit that are completely unrelated to those levied in the EEOC charge. *Id.* at 1279–80. When a

plaintiff asserts a new claim in his complaint that is not reasonably related to discrimination alleged in the EEOC charge, a court must find that claim is barred because the plaintiff has not exhausted his administrative remedies for the new claim. *See, e.g.*, See *Hillemann v. Univ. of Cent. Fla.*, 167 F. App'x 747, 749–50 (11th Cir. 2006) (per curiam) (affirming district court's dismissal of plaintiff's Title VII claims for retaliation and discrimination based on sex and race because his EEOC charge supported only an age discrimination claim based on failure to hire); *Williams v. Revco Disc. Drug Ctrs., Inc.*, No. CV411-027, 2013 WL 12096657, at *6 (S.D. Ga. Mar. 18, 2013), *aff'd*, 552 F. App'x 919 (11th Cir. 2014) (finding that plaintiff failed to exhaust his ADEA claim because his EEOC charge included only claims for disability under the ADA and "le[ft] the box for age discrimination blank and [did] not alleg[e] any age discrimination when describing the offending conduct").

In his EEOC charge, Jackson did not allege or even mention age discrimination. Nor did he check the box for age discrimination. He alleged only race discrimination and retaliation. Neither of these is actionable under the ADEA, which applies only to age-based discrimination in the workplace. *See* 29 U.S.C. § 621. Jackson also has produced no evidence of age discrimination. He makes no argument defending his ADEA claim on the merits and does not attempt to explain

10

why he did not raise age discrimination in his EEOC charge. The City is thus entitled to judgment on Count I.

### B. Count II: Race Discrimination and Retaliation under Title VII

Title VII prohibits race-based employment discrimination, as well as retaliation for opposing or participating in an investigation of race-based employment discrimination. 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). Count II presents something of a hybrid claim. In the complaint, it is labeled "Discrimination on the Basis of Race Under Title VII," but the allegations within the count outline a claim for Title VII retaliation, specifically retaliation in response to Jackson's filing an EEOC charge. Dkt. 1 ¶¶ 25–32. Count II also incorporates the complaint's general factual allegations. These include an allegation that the City retaliated against Jackson by effectively demoting him after he complained about Title VII discrimination within the Utilities Department and that the City discriminated against him by passing him over for opportunities and promotions in favor of employees of a different race. *Id.* ¶¶ 13, 15. Taking these general factual allegations and those within the count itself, Count II can be read as asserting three claims: two separate retaliation claims and a racial discrimination claim for failure to promote.[4]

---

[4] The City argues that the Court should strike Jackson's retaliation claim because the complaint does not allege a separate count for retaliation and incorporates general allegations pertaining to

In the Eleventh Circuit, Title VII claims for discrimination or retaliation not supported by direct evidence, like those Jackson asserts, are evaluated under the *McDonnell Douglas*[5] burden-shifting framework. *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation. *Id.* If the plaintiff makes out a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its actions. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant provides a nondiscriminatory justification, the plaintiff must then show that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that [the plaintiff] has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1220–21 (quoting *Burdine*, 450 U.S. at 256).

---

both discrimination and retaliation into a single count. Dkt. 30 at 4–6. But Count II specifically recites factual allegations supporting a retaliation claim, and of the seven paragraphs of general factual allegations incorporated into Count II only two make pointed allegations of discrimination and retaliation. Dkt. 1 ¶¶ 13, 15. The City did not move to dismiss the complaint or for Jackson to provide a more definite statement. The general factual allegations and those within Count II put the City on notice of its alleged misconduct. The City then addressed these allegations by thoroughly questioning Jackson during his deposition about how he believed the City had retaliated against him. Dkt. 48 at 98–106, 112. The Court therefore will consider the merits of Jackson's retaliation claims.

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

This framework is not the only way for a plaintiff to use circumstantial evidence to avoid summary judgment, however. A "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (citation omitted).

Applying either framework, no reasonable jury could reach a verdict in Jackson's favor on his retaliation or discrimination claims.

### 1. Jackson cannot establish a claim for Retaliation.

Title VII forbids an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice" under Title VII, "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The first portion of this anti-relation provision is known as the "opposition clause," and the second portion is referred to as the "participation clause." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (cleaned up).

The participation clause protects an employee's activities that occur in conjunction with or after the filing of a formal charge with the EEOC. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). The opposition clause protects actions such as "complaining or threatening to complain about alleged discrimination against oneself or others; providing information in an employer's internal investigation of an EEO matter; refusing to obey an order reasonably believed to be discriminatory; [or] advising an employer on EEO compliance." *See* EEOC Enforcement Guidance on Retaliation and Related Issues, https://www.eeoc.gov/laws/guidance/-retaliation-guidance.cfm.

To make out a prima facie case for retaliation, a plaintiff must show that: (1) he engaged in activity protected under Title VII—participation or opposition; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013).

Mr. Jackson asserts he was retaliated against for engaging in participation and opposition activity. He cannot make out a prima facie case under either theory.

### a. Participation Claim

Jackson asserts a participation claim by alleging that he received a performance improvement plan (PIP) in retaliation for filing an EEOC charge. He can establish the first two elements of a prima facie claim. Filing an EEOC charge

14

is activity expressly protected by Title VII's anti-retaliation provision. 42 U.S.C. §
2000e-3(a). Likewise, the PIP constituted an adverse action—one that "might have
dissuaded a reasonable worker from making or supporting a charge of
discrimination." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)
(quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The
PIP was a disciplinary action and put Mr. Jackson on notice that if his subpar
performance continued, he could be disciplined further or terminated. *See* Dkt. 48-
1. The PIP also increased Jackson's reporting requirements and subjected him to
more thorough supervision. A jury could find that this could have dissuaded a
reasonable worker from wanting to support an EEOC charge. *Smith v. Quintiles
Transnat'l Corp.*, 509 F. Supp. 2d 1193, 1203 (M.D. Fla. 2007) (finding that
similar PIP was an adverse action in support of a Title VII retaliation claim).

Mr. Jackson, however, cannot establish a causal link between his filing the
EEOC charge and the City's action. To establish the causal connection needed for
a retaliation claim, a plaintiff must show "that the desire to retaliate was the but-
for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v.
Nassar*, 570 U.S. 338, 352 (2013). A close temporal proximity between the
protected activity and the adverse action can be circumstantial evidence of
causation. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 (11th Cir.
2002). But as the Eleventh Circuit has warned, "mere temporal proximity, without

15

more, must be very close" to suggest a causal connection. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation and internal quotation marks omitted). And "[i]f there is a substantial delay between the protected expression and the adverse action [,] in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Indeed, the Eleventh Circuit has held that a three-month period between the protected expression and adverse action, absent other evidence of causation, is such a delay and does not allow a reasonable inference of a causal relationship. *See, e.g.*, *id.* at 1221; *Thomas*, 506 F.3d at 1364.

Mr. Jackson filed his EEOC charge in April 2019 and received the PIP in November that year. This seven-month span between the two events is too attenuated to establish a causal link on its own, and Jackson has offered no other evidence to support his belief that the PIP was retaliatory besides that he received it after filing the EEOC charge. This is insufficient to establish a causal connection.

### b. Opposition Claim

Mr. Jackson asserts an opposition claim by contending that the City retaliated against him by effectively demoting him after he complained of discrimination to his superiors. This claim fails as well.

For starters, there is no evidence that Mr. Jackson ever opposed Title VII discrimination within the Utilities Department before his reassignment to Meter Lead—the alleged demotion. In his deposition, Jackson claimed that he made several verbal and written complaints to his supervisors between 2016 and 2019. Yet he could not recall any details of these supposed complaints. Dkt. 48 at 98–103. And when pressed, Jackson admitted that he did not make a written or verbal complaint to any of his supervisors before he was reassigned to the Meter Lead position as part of the Utilities Department reorganization. *Id.* at 100.

The only verifiable complaints Mr. Jackson raised were the 2018 pay grievance and the anonymous letter he wrote to HR in 2016. But neither constituted actionable opposition. When making his pay grievance, Mr. Jackson never suggested to any City employee in either the Utilities or HR Departments that he had not been paid because of his race. And as for the letter, there is no evidence that any of Jackson's supervisors at the time of the reorganization knew that he wrote it. Most importantly, Utilities Director Tracy Mercer, the person responsible for the department reorganization and Jackson's alleged demotion, did not even begin working for the City until 2018—two years after Jackson wrote the letter. Dkt. 32 at 67, 120. Without evidence that the relevant decisionmakers knew that Mr. Jackson wrote the letter, this letter cannot constitute actionable

opposition.[6] *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir.

1999) (noting that "[a]t a minimum, a plaintiff must generally establish that the

employer was actually aware of the protected expression at the time it took adverse

employment action") (citation omitted).

Jackson also did not suffer an adverse employment action. Jackson's

position change was not a demotion. It was not disciplinary, and his hourly pay

remained the same. Dkt. 32 at 67; *see Mitchell v. Univ. of N. Ala.*, No. 16-CV-

00102-HNJ, 2018 WL 4184589, at *14 (N.D. Ala. Aug. 31, 2018), *aff'd*, 785 F.

App'x 730 (11th Cir. 2019) (finding position change resulting from employer

reorganization did not constitute a materially adverse action for a Title VII

retaliation claim because plaintiff received no discipline, reduction in pay, or other

material change in her employment). The only change for Mr. Jackson was the

reduction in supervisory responsibility and overtime hours, which was to Jackson's

benefit as he had complained to his supervisors before the reorganization that he

---

[6] Mr. Jackson did testify that in 2016, Linda Fischer, who later served as the interim director of the Utilities Department from May 2017-May 2018, told him that he had been promoted to Pipeline Repair Lead because he had filed a grievance—the anonymous letter. Dkt. 48 at 17. Fischer was not Jackson's supervisor at the time of the alleged statement or in his supervisory chain. *Id.* Jackson does not know how she would have known that he wrote the letter because he had not told anyone that he wrote it. *Id.* at 64. It is also unclear how this conversation could have occurred in 2016 because Jackson was not promoted until March 15, 2017. Dkt. 48-3. But even if this conversation took place as Jackson claims, there is no evidence, and Jackson does not suggest, that Tracy Mercer, the one responsible for his position change, knew of the letter or that Jackson had written it.

was stressed and overworked. Dkt. 32 at 122; Dkt. 48 at 82. The stress of working considerable overtime is what drove him to seek a transfer out of the Maintenance Division. *See* Dkt. 32 at 118.

Finally, there is also insufficient evidence of a causal nexus between Jackson's position change and any conceivable opposition he might have engaged in. Jackson's reassignment to Meter Lead occurred in late 2018 or early 2019—at least seven months after the pay grievance and more than two years after the anonymous complaint—and Jackson has offered no other evidence, aside from the loose temporal connection, that his reassignment was retaliatory and not simply part of the Department's overall restructuring effort.[7]

---

[7] Mr. Jackson also argues that the three write ups he received between late 2016 and 2018 were retaliation for his opposition activity. These incidents were first raised in Jackson's response to the City's motion for summary judgment and pose yet another retaliation theory. Because this theory was not properly raised, the Court will not consider it. *See Cacciamani v. Target Corp.*, 622 F. App'x 800, 804 (11th Cir. 2015) (affirming district court's refusal to consider plaintiff's new theory raised for the first time in response to motion for summary judgment and considering it "too little, too late"); *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) (explaining that a "plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."). And even if the Court were to consider these write ups, none of them is actionable. The write ups he received in 2016 and 2017 are not actionable because they occurred more than 300 days before Jackson filed his EEOC charge. *See* 42 U.S.C. § 2000e–5(e)(1); *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002) (stating that in a deferral state such as Florida, "only those claims arising within 300 days prior to the filing of the EEOC's discrimination charge are actionable"). The final write up for Jackson's failure to shut down the valves occurred within the EEOC charge period but fails on the merits for the same reasons as the properly raised opposition claim—lack of valid opposition and lack of causation.

## 2. Jackson cannot establish a claim for race discrimination.

The only concrete allegation of racial discrimination Jackson raises is that he was passed over for opportunities and promotion in favor of employees of another race. Dkt. 1 ¶ 13. In his pleadings, Jackson does not identify a specific example of when he was denied these opportunities. From the record, the only possible promotion opportunity Jackson could be referring to is the Division Supervisor position created during the reorganization. This was the position Jackson identified as the next progression after Pipeline Repair Lead. Dkt. 48 at 129. The position was filled by Jonathan Vice, a white employee, who Mr. Jackson claims was serving in a position below Jackson's before he was elevated to Division Supervisor as part of the Department's restructuring. *Id.* at 111.

To establish a prima facie case for racially discriminatory failure to promote, a plaintiff must establish that: (1) he was a member of a protected class; (2) he was qualified for and applied for the job; (3) he was rejected; and (4) someone outside that protected class was promoted. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005). When an employer does not formally announce a position opening but uses informal and subjective procedures to identify a candidate, the plaintiff need not prove that he applied for the opening. Rather, the plaintiff must only show that the employer had some reason to consider him for the position. *Id.* at 768.

20

Here, the City had no reason to consider Jackson for Maintenance Division Supervisor because he was not qualified for the job. As Pipeline Repair Lead, Jackson only supervised employees within a subset of the Maintenance Division. At the time of the reorganization, Jonathan Vice was the Pipe and Motor Lead in charge of the Pipe and Motor subset of the Division and was working at a higher paygrade than Mr. Jackson. Dkt. 32 at 120. In addition to having a pipe and motor skill set, Vice also had ten years of pipeline repair experience in another municipality. *Id.* at 121. Because Vice had extensive experience in multiple sections within the Maintenance Division, something Mr. Jackson lacked, Mercer appointed Vice the Maintenance Division Supervisor. *See id.* at 120–21.

But even assuming Jackson was qualified for the Supervisor role, his claim falters at the second and third steps of the *McDonnell Douglas* framework. Vice's superior skill set was a valid nondiscriminatory reason for his selection for the position, and Mr. Jackson has offered no evidence to rebut this justification other than his own opinion that Vice was not qualified for the job. *See* Dkt. 48 at 36–37, 111. "In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted). Rather, a plaintiff "must show that the disparities between the successful applicant's and his own

qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (citation omitted). Mr. Jackson has not made such a showing.

In short, the decision to reorganize the Maintenance Division with Vice filling the supervisor position was Director Mercer's to make. "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions." *Kidd*, 731 F.3d at 1203 (citation omitted). The Court declines to sit in such a capacity here.

For the reasons stated, no reasonable jury could find that the City discriminated or retaliated against Jackson in violation of Title VII. The City is therefore entitled to judgment on Count II.[8]

---

[8] In his response, Mr. Jackson raises for the first time examples of disparate treatment. These examples include supervisors asking employees to provide information on Jackson's behavior that would lead to his termination, giving easier assignments to white workers and the more arduous ones to black workers, and supervisors overriding Jackson's directives to subordinates. Dkt. 43 at 9–10. These new claims are supported by Jackson's own deposition testimony and unsworn witness statements apparently taken from Jackson's coworkers. *See* Dkts. 38–42; Dkt. 48 at 27, 117. These claims can be rejected for several reasons. First, they were raised for the first time in Jackson's response. *Miccosukee Tribe*, 716 F.3d at 559–60 (declining to consider allegations raised for the first time in response to summary judgment that were not previously included in the complaint). Second, the Court will not consider the witness statements of Jackson's coworkers because they are unsworn and not made under penalty of perjury. *See* Fed. R. Civ. P. 56; 28 U.S.C. 1746; *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980); *Holloman v. Jacksonville Hous. Auth.*, No. 06-10108, 2007 WL 245555, at *2–4 (11th Cir. Jan. 30, 2007) (refusing to consider unsworn affidavits when reviewing grant of summary judgment). Finally, on the merits, these alleged acts are not the type of conduct that can form the basis of a Title VII disparate treatment claim as Jackson provides no evidence that these actions "impact[ed] the terms, conditions, or privileges of [his] job in a real and demonstrable way." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920–21 (11th Cir. 2018) (cleaned up).

## IV. CONCLUSION

There is no genuine dispute as to material fact: The City did not discriminate against Jackson in violation of the ADEA or Title VII. The City's Motion for Summary Judgment (Dkt. 30) is therefore **GRANTED**. The Clerk is directed to enter judgment for the City and to terminate all pending motions and deadlines.

**DONE AND ORDERED** at Tampa, Florida, on July 30, 2021.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO:**</u>
Counsel of Record

23